J-A19043-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| DANIEL J. DOUGHERTY, | : | |
| | : | |
| Appellant | : | No. 1648 EDA 2016 |

Appeal from the Judgment of Sentence April 11, 2015
in the Court of Common Pleas of Philadelphia County,
Criminal Division, No(s): CP-51-CR-0705371-1999

BEFORE: BENDER, P.J.E., DUBOW and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.: **FILED OCTOBER 31, 2017**

Daniel J. Dougherty ("Dougherty") appeals from the judgment of sentence entered following his conviction of two counts of second-degree murder and one count of arson.[1] We reverse Dougherty's judgment of sentence and remand for a new trial.

The trial court summarized the factual history underlying the instant appeal as follows:

> [O]n August 24, 1985, [] Dougherty was supposed to return to his girlfriend's home after attending an Alcoholics Anonymous meeting[,] and tend to his children, as well as the child of his live-in girlfriend, Kathleen McGovern [("McGovern")]. [] Dougherty did not go home. At approximately 11:30 p.m., [Dougherty] was in a bar when [] McGovern stormed in and angrily confronted him, telling Dougherty to get home with his kids because she was leaving him. McGovern returned to her Oxford Circle home, packed up some of her belongings and left with her child, leaving the two young Dougherty boys[2] asleep in

---

[1] 18 Pa.C.S.A. §§ 2502, 3301.

[2] The boys were aged three and four years old, respectively.

their second-floor bedroom with a teenage babysitter. By 1:30 a.m.[,] the babysitter could stay no longer and returned to her residence next door, leaving a note for [Dougherty] and explaining to him what had occurred.

Leaving the bar, Dougherty did not go home, but to the home of his estranged wife, the mother of his two children, Kathleen Dippel [("Dippel")]. Dougherty pleaded with his estranged wife to come with him and take the children[,] as his girlfriend had kicked him out. Dougherty got mad at Dippel for not wanting to come with him and get the children in the middle of the night, and returned home. He did not stay, reappearing at the house of his wife. Dippel finally agreed and came with Dougherty to take custody of the two children. Once they got to McGovern's house, [Dougherty] asked Dippel to spend the night. [] Dippel declined Dougherty's advances and asked [Dougherty] to bring the children downstairs. Dougherty refused, unceasingly demanding Dippel to go upstairs to retrieve the children. In fear of being sexually assaulted by [Dougherty], Dippel refused to go upstairs. Weary of [Dougherty's] advances, Dippel left, barefoot and without the children. Thereafter, Dougherty was the only adult in the house while the children slept upstairs.

At approximately 3:57 a.m., police responded to reports of a fire at the residence. By the time the police responded, the house was in flames and [Dougherty was] outside of the house. When asked his name, Dougherty replied, "my name is mud and I should die for what I did." The two boys were found dead in their upstairs bedroom. The medical examiner concluded that the children died from smoke inhalation and carbon dioxide poisoning[,] and may have been burned while still alive.

[Dougherty] was subsequently questioned by the police. Dougherty told them that after Dippel left, he fell asleep on the sofa, to be awoken by the noise of the fire on the drapes adjacent to the front window.

Trial Court Opinion, 9/1/16, at 3-5 (citations omitted, footnote added).

On July 21, 1999, more than 13 years after the fire, Dougherty was arrested and charged with arson, murder and related offenses. In October

2000, a jury found Dougherty guilty of two counts of first-degree murder[3] and arson. Dougherty was sentenced to death for his convictions of first-degree murder, and a concurrent sentence of 10-20 years in prison for his conviction of arson. The Pennsylvania Supreme Court affirmed Dougherty's judgment of sentence on direct appeal. **Commonwealth v. Dougherty**, 860 A.2d 31 (Pa. 2004). On October 3, 2005, the United States Supreme Court denied Dougherty's Petition for *Certiorari*. **Dougherty v. Pennsylvania**, 546 U.S. 835 (2005).

In 2005, Dougherty filed his first Petition for relief pursuant to the Post Conviction Relief Act ("PCRA").[4] The PCRA court dismissed Dougherty's Petition in April 2009. On appeal, the Pennsylvania Supreme Court remanded the matter for the appointment of a new PCRA judge and to develop the record. On February 7, 2012, upon the agreement of the parties, Dougherty's death sentences were vacated, and sentences of life in prison were imposed for each of Dougherty's murder convictions.

On remand, the PCRA court conducted hearings on Dougherty's claims of ineffective assistance of trial counsel. The PCRA court ultimately dismissed Dougherty's Petition on September 6, 2012. On appeal, this Court vacated the Order of the PCRA court, and remanded for a new trial.

---

[3] **See** 18 Pa.C.S.A. § 2502.

[4] 42 Pa.C.S.A. §§ 9541-9546.

***Commonwealth v. Dougherty***, 93 A.3d 520 (Pa. Super. 2013) (unpublished memorandum).

Following a jury trial, Dougherty was convicted of two counts of second-degree murder and one count of arson. For his convictions of second-degree murder, the trial court sentenced Dougherty to two consecutive terms of life in prison. For his conviction of arson, the trial court imposed a concurrent prison term of ten to twenty years. Thereafter, Dougherty filed the instant timely appeal, followed by a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

Dougherty presents the following claims for our review:

1. [The Pennsylvania Superior Court] found [Dougherty's] original trial counsel constitutionally ineffective for failing to adequately cross-examine Assistant Fire Marshal John Quinn [("Quinn")] at Dougherty's first trial in 2000. Because Dougherty never had a full and fair opportunity to cross-examine Quinn, did the trial court violate the Confrontation Clause when it permitted Quinn's prior recorded testimony, including the constitutionally ineffective cross-examination, from 16 years ago to be read to the jury over Dougherty's objections?

2. In 2015, shortly before Dougherty's second trial, the Commonwealth's expert at the first trial, [] Quinn, acknowledged through counsel that the field of fire science had advanced "incalculably" since his original testimony in October 2000. Did the trial court commit reversible error under Pennsylvania Rule of Evidence 702 when it (1) allowed Quinn's 16-year-old recorded "expert" testimony to be read to the jury[;] and (2) instructed the jury at the 2016 trial that Quinn was testifying as an expert?

3. Before his second trial, Dougherty proffered evidence that the Commonwealth's expert at the first trial, [] Quinn, employed principles that were not generally accepted in the field of fire science either at the time he testified in 2000 or at the time the

- 4 -

Commonwealth sought to reintroduce that testimony in 2016. Did the trial court commit reversible error by admitting this testimony without holding a hearing to determine if Quinn's methodology was "generally accepted in the relevant field[,]" as required under *Frye v. United States*[, 293 F. 1013 (D.C. Cir. 1923),] and Pennsylvania Rule of Evidence 702(c)?

4. Did the trial court commit reversible error when it admitted an inflammatory photograph of the burned bodies of Dougherty's deceased children, even though the photograph lacked any probative value and other, less inflammatory, evidence was available?

5. Did the trial court commit reversible error under [Pa.R.E.] 404(b)(1) when it permitted the testimony of two women that Dougherty was physically abusive to them in the past, particularly where the Commonwealth told the jury in closing that this character evidence establishes "who this man is," *i.e.*, the kind of person who "gets violent, especially against women when they don't do what he wants them to do[,]" and Dougherty was not charged with any acts of violence towards women?

6. Did the trial court commit reversible error by allowing the Commonwealth[,] during closing statements[,] to compare Dougherty's expert witness to, among other things, a charlatan, a prostitute, and an adulterer, despite constitutional due process guarantees that prohibit prosecutors from engaging in unduly prejudicial or inflammatory rhetoric at trial?

Brief for Appellant at 2-4.

In his first claim, Dougherty asserts that the trial court improperly permitted the prior trial testimony of Quinn, a Philadelphia Assistant Fire Marshal, to be read to the jury. *Id.* at 22. Dougherty points out that this Court had "deemed his trial counsel ineffective for inexplicably opting to 'wing it' during cross-examination of the Commonwealth's expert, [] Quinn." *Id.* According to Dougherty, the trial court improperly permitted the Commonwealth to present Quinn's same testimony, including defense

- 5 -

counsel's ineffective cross-examination, to the jury. *Id.*; *see also id.* at 24 (wherein Dougherty points out that this Court deemed his prior trial counsel ineffective for failing to consult with a fire expert in preparing to cross-examine Quinn at the first trial).

Regarding the admission of Quinn's testimony, Dougherty argues that the trial court violated the Confrontation Clause of the Sixth Amendment to the United States Constitution, as he was deprived of a full and fair opportunity to cross-examine Quinn. *Id.* at 23. In addition, the reading of Quinn's testimony deprived Dougherty of the opportunity to effectively cross-examine Quinn, this time with the assistance of a fire expert. *Id.* at 24. According to Dougherty, "[t]he result was that trial counsel's failure to elicit expert fire testimony deprived [Dougherty] of the opportunity to discredit entirely the testimony that was the sole basis for concluding that the fire was arson." *Id.* (internal quotation marks and citation omitted).

The Commonwealth counters that at the retrial, in addition to Quinn's prior testimony, they presented the expert testimony of fire investigator Thomas Schneiders ("Schneiders"), who testified that there was no "flashover" in this fire. Brief for the Commonwealth at 17. The Commonwealth acknowledges that Schneiders "based his independent opinion on his examination of [] Quinn's photographs, interviews and report." *Id.* The Commonwealth points out that Schneiders validated Quinn's methodology, and "independently concluded that the fire was set in

three separate locations." *Id.* at 21. The Commonwealth additionally asserts that Schneiders challenged the defense expert's conclusions regarding flashover. *Id.*

Whether the admission of prior testimony violates a defendant's rights under the Confrontation Clause is a question of law, for which our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Yohel*, 79 A.3d 520, 530 (Pa. 2013).

"Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."[5] *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004). The Confrontation Clause of the Sixth Amendment of the United States Constitution, made applicable to the states via the Fourteenth Amendment,[6] provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him…." U.S. CONST. amend XVII.[7] Interpreting the Confrontation Clause, the United States Supreme Court explained that

---

[5] The Supreme Court defined "testimony" as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51.

[6] *See Pointer v. Texas*, 380 U.S. 400, 403 (1965).

[7] Although Dougherty has not premised his argument on Article I, Section 9 of the Pennsylvania Constitution, that section similarly provides that "[i]n all criminal prosecutions the accused hath a right . . . to be confronted with the witnesses against him. . . ." PA. CONST. art. I, § 9.

"[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59; *see also Bullcoming v. New Mexico*, 564 U.S. 647, 664-68 (2011) (holding that the Confrontation Clause was violated where the state introduced a blood-alcohol analysis report through the surrogate testimony of a second analyst, where that analyst had not certified the report or performed or observed the testing); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009) (holding that the defendant was entitled to confront forensic analysists who had prepared a report regarding the weight of cocaine seized, absent a showing that the analysts were unavailable and that the defendant had a prior opportunity to cross-examine them).

Similarly, our Supreme Court has long recognized that prior testimony is admissible against the defendant only if the defendant had a "full and fair" opportunity to examine the witness. *Commonwealth v. Bazemore*, 614 A.2d 684 (Pa. Super. 1992). In *Commonwealth v. Mangini*, 425 A.2d 734 (Pa. 1981), our Supreme Court addressed whether testimony of a currently unavailable witness, given at the defendant's first trial, could be introduced at the defendant's second trial. *Id.* at 737. In that case, the second trial was made necessary by prior counsel's ineffectiveness for failing to either request a competency hearing for a witness, or to object to that witness's competency on the record. *Id.* Our Supreme Court held that the witness's

prior testimony could not be used, where "the use in the present trial of the very testimony which has been indelibly stamped with prior counsel's ineffectiveness is offensive to our sense of justice and the notion of fair play." *Id.* at 738. The Supreme Court cautioned, however, that "our holding today is not a *per se* rule requiring exclusion of any testimony from a prior trial wherein trial counsel had been ineffective." *Id.* at 739. To the contrary, the resolution of a similar claim in a different case would require an examination of "all of the factual variables … to determine if the ineffectiveness so tainted the testimony sought to be introduced as to affect its reliability or to otherwise render its subsequent use unfair." *Id.* at 738 (footnote omitted).

Subsequently, in **Bazemore**, our Supreme Court concluded that the defendant was denied a full and fair opportunity to cross examine a witness, whose prior testimony was offered at trial, where the defendant was denied access to vital impeachment evidence at or before the time of the prior proceeding. **Bazemore**, 614 A.2d at 688. In **Bazemore**, witness Melvin Hauser ("Hauser"), had testified at the defendant's preliminary hearing. **Id.** at 685. Defense counsel cross-examined Hauser at that hearing. **Id.** However, defense counsel was unaware, or had not been informed, of evidence that could impeach Hauser, *i.e.*, that Hauser had made a prior inconsistent statement to police; that Hauser had a criminal record; and that the Commonwealth, at the time of the preliminary hearing, was

contemplating filing criminal charges against Hauser for homicide and criminal conspiracy, involving the same incident. *Id.* Prior to trial, Hauser invoked his Fifth Amendment right against self-incrimination, thereby rendering him unavailable as a witness. *Id.* In response, the defendant filed a motion *in limine* seeking to preclude the Commonwealth from using Hauser's preliminary hearing testimony at trial. *Id.* The trial court granted the motion, after which the Commonwealth filed an appeal. *Id.* On appeal, this Court vacated the order of the trial court. *Id.*

On allowance of appeal, our Supreme Court explained that "the opportunity to cross-examine must be *fair*[,] given the circumstances of the particular matter[,] in order for such cross-examination to be deemed adequate[.]" *Id.* at 686 (emphasis in original).

> The real basis for the admission of testimony given by a witness at a former trial is to prevent the miscarriage of justice where the circumstances of the case have made it unreasonable and unfair to exclude the testimony. It naturally follows that testimony from the former trial should not be admitted if to do so would result in a miscarriage of justice.

*Id.* (quotation marks and citation omitted). This exception, though, "is predicated on the indicia of reliability normally afforded by adequate cross-examination. … [W]here … that indicia of reliability is lacking, the exception is no longer applicable." *Id.* at 687 (internal quotation marks and citation omitted). The ***Bazemore*** Court emphasized that where the admission of prior testimony is being sought as substantive evidence against the accused, "the standard to be applied is that of *full and fair opportunity* to cross-

examine." *Id.* (emphasis in original); *accord Commonwealth v. Cruz-Centeno*, 668 A.2d 536, 542-43 (Pa. Super. 1995) (recognizing that where the defense, at the time of the prior testimony, "was denied access to vital impeachment evidence … a full and fair opportunity to cross examine the unavailable witness may be deemed to have been lacking" during the prior testimony).

Here, on prior appeal, this Court reviewed Quinn's testimony in the context of Dougherty's claim of ineffective assistance of trial counsel. In that appeal, Dougherty argued that "trial counsel's failure to retain either a consulting or testifying expert in fire science left counsel unprepared against Quinn's testimony, which comprised the most compelling evidence of [Dougherty's] guilt." *Dougherty*, 93 A.3d 520 (unpublished memorandum at 9). This Court agreed, observing, *inter alia*, that

> [g]iven that fourteen years had passed, counsel should have determined whether the science which formed the basis of Quinn's opinions in 1985 was subject to new theories which had been developed in the forensic fire community. Regardless[,] the lack of investigation into the science precluded trial counsel from ever understanding whether the science was accurate, the main claim asserted by [Dougherty]. Because fourteen years had passed, the reliability of the evidence itself[,] or the science underlying it[,] should have been important in addressing the arson charge.
>
> *       *       *
>
> [I]f counsel had retained either a consulting or testifying fire expert, he could have mounted a convincing challenge to the substance of the charges arrayed against his client. **As the PCRA court noted, the scientific evidence proffered by Quinn was "the fulcrum of the whole case" against**

- 11 -

**[Dougherty], and Quinn's conclusions "were the lynchpin" to the charges against [Dougherty].** Trial Court Opinion, 9/11/12, at 27. In a capital case[,] such as the present matter at the time of trial, mounting a meaningful challenge to the scientific component of the Commonwealth's case should have been the top priority of any competent defense lawyer. **Through informed cross-examination or, alternatively, presentation of a fire expert, counsel could have demonstrated to the jury that Quinn overlooked the effects of flashover and full-room involvement in a compartment fire. Such testimony would tend to show that Quinn incorrectly identified multiple points of origin for the fire, that his conclusions lacked scientific underpinning, and that his opinions conflicted with principles of forensic fire investigation that were widely accepted at the time of trial.** This, in turn, would have provided counsel with an evidentiary foundation from which to assert that the fire had a single point of origin and that the cause of the fire was accidental or, at best, undeterminable….

*Id.* (unpublished memorandum at 14, 15-16) (emphasis added). Thus, Dougherty, through counsel's ineffectiveness, was not afforded a full and fair opportunity to cross-examine Quinn.

Contrary to the Commonwealth's assertions, the taint of counsel's ineffectiveness was not alleviated through the additional testimony of its expert, Schneiders. At the re-trial, in addition to the prior testimony of Quinn, the Commonwealth presented the testimony of Schneiders, a fire investigator. A substantial portion of Schneiders's testimony focused on Quinn's investigation, or, rather, what Quinn's investigation would have entailed. For example, the prosecutor asked Schneiders to testify regarding

the actions undertaken by Quinn to investigate the fire. N.T. (Morning), 3/28/16, at 32.[8] Schneiders, however, responded as follows:

> [Schneiders]: [] Quinn—when we process the scene now that the fire is out and it's clear of smoke and steam and, you know, usually some—you never really clear it initially. You start your search of the house.
>
> …
>
> And with that—all the firefighting operations is [*sic*] halted. Everybody don't touch [*sic*] nothing.
>
> So they would fog it out. And fogging it out, basically, you put a water stream in a window, bring it in the house, and put on a big fog pattern that acts as an exhaust to get smoke out. Then you look for hotspots. Sometimes you have to turn things over that are on fire still, and things have collapsed through the course of the fire where the material degrades, and also you have the steam and the smoke. So you are running around trying to put out the little—we call them "hotspots" after the fire.
>
> So everybody calms down. You take a real hard look at everything, and [] Quinn would do that and did.
>
> In fact, this house, he searched the areas of the house, and now we are looking for patterns. And one of the things that fire investigators do, you look for—you count from areas—let's say least burned to the heaviest burned. What we mean is when you search through the house, what you are going to look for is, well, what was on fire and what was not on fire. That's what we call the least to the heaviest amount of damage.
>
> So, Quinn would go in the basement. They would go in the first floor, then the third. So you are doing this assessment and looking around the house. So you do all three, sometimes in different orders. The order doesn't matter.

---

[8] Both volumes of the Notes of Testimony of March 28, 2016, are designated as "Volume 1." Consequently, we will designate the first volume as "Morning," and the second volume as "Afternoon."

So then you look at this house, and you look at a house … it's a little house. So this house doesn't have any windows on the side of the house. It only has windows front and back. … So you are taking that all into consideration.

But to get back to where I was a second ago, the first thing you do is, you look at—and you get your line and see what was on fire, [and] what wasn't on fire. So when we work from what we call the least amount of damage to the heaviest amount of damage.

*Id.* at 32-34. Schneiders's testimony continued in the same manner. For example, Schneiders testified that

[w]hen we say the least amount of damage, you—[] Quinn based—looked at the heater, the electric fuse panel. He looked at the other items in the basement, and you could effectively see that there was—really the fire didn't start there because of that's, guaranteed, the least amount of damage in the basement/garage.

\*     \*     \*

Q. [The Commonwealth]: [] Schneiders, in terms of walking through the living room and dining room, which had the most damage of the two?

A. [Schneiders]: Without a doubt, the living room, and the dining room second to that.

Q. What did [] Quinn do and see? And walk us through that.

A. Well, again, we are looking at burn patterns, fire patterns, but we use "burn" and "fire" interchangeably.

You are looking at—like I said earlier, as a firefighter, you learn the typical way that a fire—and you draw in experience. You have to. And you see what a fire would look like if it started in a couch or what it would look like in a loveseat, and it's basically furniture that everyone has in their house.

And then, like, this was—the dining room table was somewhat unique. It was a very sturdy, heavy, wooded—almost

- 14 -

like a bench, like a picnic-bench-type thing. It wasn't a picnic bench[,] but resembled that, heavy pieces of wood. And, you know, wood is obviously combustible.

And then there was other furniture in the living room. There was a cocktail table, [and] TV.

The dining room, there was bureau and china cabinet. The dining room was paneled, the wood paneling on top of the plaster, so you would look at that.

And then you are really looking for something we call a V-Pattern. It's like the letter V. The fire resembles that. That's like the fingerprinting that we are looking for. We are looking for this fire pattern and the burn. Again, it will burn things in its path. That's what we are talking about, the amount of consumption as opposed to lack of consumption next to it.

Like sometimes—and, here, you could see the fire patterns were on the wall, and you could see some areas, definite lines of demarcation.

*Id.* at 35, 41-43.

In his testimony, Schneiders did confirm that Quinn documented the location of various items following the fire, and interviewed witnesses. *Id.* at 57-58. Schneiders further testified that Quinn took samples of the floor and carpeting, and sent those to the laboratory for analysis. *Id.* at 60. Schneiders stated for the jury Quinn's opinion regarding the origin of the fire. *Id.* at 61-62. Finally, when asked whether he agreed with Quinn's "sentiments as to where and how the fire was caused[,]" Schneiders confirmed that he did, explaining that

I did a tremendous amount of research, looking at the pictures, thinking about myself, if I was in this house first as a firefighter …. Then I would think to myself first, as an investigator, what I would do, and what I did see and see if he—all the steps would

- 15 -

be taken, and they were, to see if the methodology was reasonable, and it was.

*Id.* at 63. Immediately thereafter, Schneiders stated his opinion that there was no "flashover" on the second floor of the building. *Id.* at 69.

Schneiders then reviewed photographs of the scene taken after the "mop up operation." *Id.* at 72. From these photographs, Schneiders testified about Quinn's documentation of the crime scene, the purpose for Quinn's actions in investigating and documenting the scene, and Schneiders's own description of what the photographs revealed. *See id.* at 75-126. Describing the photograph of the bodies of the victims, Schneiders opined that, from the lack of burning to the bodies, there was no flashover on the second floor. *Id.* at 126. Finally, Schneiders testified that based upon his examination of all the facts, he classified the fire as "incendiary," with three points of origin. N.T. (Afternoon), 3/28/16, at 11-12.

At the new trial, Dougherty, with the assistance of experts, cross-examined Schneiders about the basis for his opinion. Schneiders's testimony provided no opportunity to challenge Quinn's investigation, as Schneiders testified as to what he thought Quinn "would have" done during the investigation. Dougherty could not effectively cross-examine Schneiders regarding the scientific basis for Quinn's opinions. As this Court recognized, in addressing Dougherty's PCRA appeal,

> the issue of whether the August 24, 1985 fire was caused by arson was **the** bedrock inquiry at [Dougherty's] trial[,] and Quinn's testimony supplied the scientific support for the

- 16 -

Commonwealth's contention that the fire was intentionally started and that [Dougherty] was the individual who ignited it. In failing to acquaint himself with the relevant forensic principles or, alternatively, to present an expert in fire science, [Dougherty's] counsel essentially allowed the Commonwealth to prove the most critical elements of its case without meaningful challenge by the defense. Moreover, if trial counsel had undertaken an informed cross-examination of Quinn, and/or presented testimony from an expert in fire science, there is a reasonable possibility that such efforts would have had the spillover effect of causing the jury to view testimony regarding [Dougherty's] admissions through a more skeptical lens or, at least, view such testimony as expressions of [Dougherty's] moral regret or remorse, and not inculpatory declarations of his legal guilt….

**Dougherty**, 93 A.3d 520 (unpublished memorandum at 20-21) (emphasis in original).

Viewed in this light, the record does not support the conclusion that Dougherty had a "full and fair" opportunity to cross-examine Quinn during the first trial. Dougherty was deprived of this opportunity through the violation of his Sixth Amendment right to effective counsel. In addition, Schneiders's testimony did not remove the taint caused by counsel's ineffectiveness. Applying **Bazemore** and its progeny, we conclude that the trial court erred in admitting the prior testimony of Quinn at Dougherty's re-trial.

Our analysis, however, does not conclude at this point. We next look to determine whether the error in admitting Quinn's prior testimony was harmless.

If an appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict, the error is

harmless. However, if there is a reasonable possibility that the error may have contributed to the verdict, it is not harmless. The Commonwealth bears the burden of establishing harmlessness beyond a reasonable doubt. Specifically, we will find harmless error where:

(1) the error did not prejudice the defendant or the prejudice was *de minimis*;

(2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or

(3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Hicks*, 156 A.2d 1114, 1156 (Pa. 2017) (internal quotation marks and citations omitted).

As set forth above, during much of his testimony, Schneiders testified as to what Quinn would have done during his investigation, and validated Quinn's conclusions. The error in admitting Quinn's testimony was prejudicial to Dougherty, and the prejudice was not *de minimis*. Quinn's testimony was not merely cumulative at the second trial, as much of Schneiders's testimony focused on Quinn's methods and investigation. Finally, we cannot conclude that the properly admitted evidence of guilt was so overwhelming, and the prejudicial effect was so insignificant, that the error could not have contributed to the verdict. **See id.** For this reason, we are constrained to conclude that the trial court erred in admitting the prior testimony of Quinn at Dougherty's re-trial, and the error was not harmless.

Accordingly, we reverse Dougherty's judgment of sentence and remand for a new trial.

In his second and third claims of error, Dougherty challenges the admission of Quinn's prior testimony. As we have concluded that the trial court erred in admitting Quinn's prior testimony, we need not address Dougherty's second and third claims.

In his fourth claim of error, Dougherty argues that the trial court erred in permitting the Commonwealth to publish an inflammatory photograph of the burned bodies of Dougherty's children. Brief for Appellant at 42. Dougherty argues that the photograph was inflammatory and had no evidentiary value. *Id.* at 44. Dougherty argues that the photograph depicted "the charred bodies of young children in their undergarments in the bed where they died." *Id.* Dougherty points out that, in closing arguments, the prosecutor acknowledged that the photograph was "just too horrific—I showed you one time, I will not again." *Id.* (citation omitted).

Regarding the evidentiary value of the photograph, Dougherty states that the Commonwealth offered the photograph as evidence that (1) if flashover had occurred …, it would have occurred upstairs as well as downstairs; (2) no flashover occurred upstairs; and therefore (3) no flashover occurred." *Id.* at 45. Dougherty argues that this evidence was irrelevant because his expert acknowledged that no flashover occurred on the second floor. *Id.* Thus, the photograph offered no essential evidence.

*Id.* Dougherty further argues that the error in admitting the photograph was not harmless, because even the Commonwealth conceded that displaying the photograph on a large screen carried the risk of "creating a scene in the courtroom[;]" and the photograph was not cumulative, as no other photograph of the burned victims was offered at trial. *Id.* at 48.

We review a challenge to the trial court's admission of photographs under an abuse of discretion standard. *See Commonwealth v. Solano*, 906 A.2d 1180, 1191 (Pa. 2006). When considering the admissibility of photographs of a homicide victim, which by their very nature can be unpleasant, disturbing, and even brutal, the trial court must engage in a two-step analysis:

> First a [trial] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

*Commonwealth v. Tharp*, 830 A.2d 519, 531 (Pa. 2003) (citation omitted). "Although the possibility of inflaming the passions of the jury is not to be lightly dismissed, a trial judge can minimize this danger with an appropriate instruction, warning the jury members not to be swayed emotionally by the disturbing images, but to view them only for their evidentiary value." *Commonwealth v. Pruitt*, 951 A.2d 307, 319 (Pa. 2008).

Our review of the record discloses that at trial, the Commonwealth offered two reasons for admission of the photograph of the victims' bodies: (1) to demonstrate the thoroughness of Quinn's investigation; and (2) to show that no extreme heat or smoke reached the second floor of the structure, thereby negating the defense's assertion that a flashover had occurred. *See* N.T. (Morning), 3/24/16, at 6 (wherein the prosecutor argued that the photographs "are relevant to show the condition of the bodies as they were found. It's important for the issue in terms of how the fire started, the damage to the house, and, you know, the resulting damage, not only to the house, but also to the victims themselves."), 7 (wherein the prosecutor argued that the photographs "go to exactly what [Quinn] did that day. He took multiple pictures of the bodies exactly where they were positioned when he went there[.]"). In opposing the admission of the photographs, however, defense counsel agreed as to the condition of the second floor, and argued that another, less inflammatory photograph was available to the Commonwealth:

> [Defense counsel]: … I don't think there's a dispute that the starting point is, are the photos inflammatory? And I don't think there's any dispute that they are inflammatory. They are horrible to look at.
>
> So then the question is, are they of such essential, probative value? And I submit to you that they are not.
>
> First and foremost, … the Commonwealth, at the first trial[,] conceded that there was no evidentiary value. They did not go at all to the cause of this fire, how this fire started. … [N]one of the experts talk about looking at the bodies having

any evidentiary value with respect to how this fire started. That's number one.

Number two, [the Commonwealth] asserts that's somehow probative with respect to the completeness or the thoroughness of [] Quinn's investigation. All of the testimony that [] Lentini will have is with respect to documenting those things that go to how this fire started, the burn patterns, those things that are asserted.

Again, the condition of the bodies is not asserted by any expert of having probative value or any relevance with respect to that, so whether they were documented or not does not go to that at all.

Finally, there's the issue of flashover[,] and the suggestion that … the photograph is probative of that issue. Again, [the prosecutor] conceded that our expert never contended that there was flashover on the second floor, so whether the boys photos show [that] there isn't doesn't provide any evidentiary value[,] because we are not suggesting that there was flashover up there. And even if this [c]ourt is inclined to suggest that there was some that the [c]ourt or the jury needs to see if there was flashover, notwithstanding that[,] we concede that there was not, there is a photo in evidence that is not nearly as inflammatory. That's C-9G, which shows white areas of the mattress.

So, for all these reasons, Judge, we think [] the Court should not admit the photograph.

*Id.* at 11-13.

Our own review of the record discloses that at trial, the Commonwealth introduced the photographs during the testimony of the Chief Medical Examiner, Samuel Gulino, M.D. ("Dr. Gulino"). Dr. Gulino described, in detail, the condition of the victims' bodies following the fire. *See id.* at 103-05, 115-16. After describing the results of autopsies of the victims, Dr. Gulino opined that each victim died of smoke inhalation. *See*

*id.* at 113, 118. Immediately thereafter, the trial court issued the following cautionary instruction:

> Ladies and Gentlemen of the jury, photos are about to be put in evidence for the purpose of showing the conditions of the scene as well as to help you understand the testimony of the witnesses who refer to it.
>
> I will warn you, they are not pleasant to look at; however, you should not let it stir up emotions to the prejudice of [Dougherty]. Your verdict must be based on a rational and fair consideration of all the evidence and not on passion or prejudice against [Dougherty], the Commonwealth, or anyone else connected with this case.

*Id.* at 119-20. The Commonwealth then asked Dr. Gulino to describe the condition of the victims, as shown in the photograph. *Id.* at 121-22. Dr. Gulino then opined that neither child was exposed to direct flame, but, rather, to smoke and intense heat. *Id.* at 122.

Subsequently, the Commonwealth's fire expert, Schneiders, referred to the photograph during his testimony. When asked what could be understood from the photograph of the victims, Schnieders stated that

> the lack of burning to the bodies; the fact that you could still see their underwear, the plastic diaper. You could still see the bedding. The bedding would have ignited. You could still see the other material right below the mattress. You could still see the pillows. I cannot—I can identify the pillow the boy's head was on.

N.T. (Morning), 3/28/16, at 126. Schneiders testified that the photograph "clearly documents, without a doubt, that there was not flashover up on the second floor in this compartment—the whole house is a compartment." *Id.*

- 23 -

In its Opinion, the trial court stated the following rationale for admitting one photograph of the victims:

> The defense strategy in the present case was to attack the Commonwealth's expert's determination that there were three points of origin of the fire and that to propose that because of the phenomena of flashover and full room involvement, it was impossible to determine the cause of the fire. The Commonwealth's experts explained that the staircase, which was part of the room set ablaze, would have acted like a chimney, and with the severe heat rising in the room, the amount of heat and smoke going up the staircase would have been considerable. The photograph of the two children on the bed depicts one of the children wearing pullups[,] which were still white and the other child wearing a diaper with the plastic still intact, negating the defense expert's hypothesis. If the extreme heat required by the defense was present, it would be expected that the plastic diaper would have melted and the white pullup would have been grey at best. Clearly[,] the photograph was a necessary element for the Commonwealth to debunk the defense expert's explanation. Thus, the probative value of the evidence is unequivocal.

Trial Court Opinion, 9/1/16, at 15.

Upon review, we conclude that the trial court improperly admitted the photograph at trial. Contrary to the trial court's reasoning, defense counsel conceded that no flashover had occurred on the second floor of the structure. Further, there was another, less inflammatory photograph available to show the lack of flashover to the mattress under the bodies. The photograph was of no additional evidentiary value to the jury, in light of the testimony of Dr. Gulino and Schneiders as to the condition of the bodies. Under these circumstances, the inflammatory nature of the photograph outweighed its evidentiary value.

Finally, we conclude that the trial court's cautionary instruction did not alleviate its inflammatory nature. As the prosecutor acknowledged in his closing argument, the photo was "just too horrific –I showed you one time, I will not again …." N.T. (Morning), 3/31/16, at 62. For this reason, we conclude that the trial court abused its discretion in admitting the photograph of the victims at trial. We therefore reverse the judgment of sentence on this basis as well, and remand for a new trial.

In his fifth claim of error, Dougherty challenges the admission of the testimony of his ex-girlfriend, McGovern, and his ex-wife, Dippel, "regarding alleged incidents of past physical abuse by Dougherty, particularly in instances where they had confronted him about his alcohol consumption." Brief for Appellant at 50. First, Dougherty challenges McGovern's testimony regarding his demeanor, when he drank, as "nasty" and "belligerent," and her statement that he sometimes became physical when drinking. *Id.* at 51. Regarding Dippel's testimony, Dougherty challenges her description of his temperament, while drinking, as "horrible," and her assertion that when drinking, he would punch her and become violent. *Id.* Dougherty argues that the only purpose of this testimony was to show that he was the kind of person who would kill his children. *Id.* Dougherty additionally points out that the prosecutor used this evidence in his closing argument. *Id.* at 51-52.

Dougherty asserts that the evidence was not admissible under Pa.R.E. 404(b). Brief for Appellant at 52. Dougherty disputes the trial court's justification for admitting this evidence, *i.e.*, that Dougherty's "pattern of alcohol[-]induced violence toward women who had challenged his drinking was clearly admissible to show motive, revenge, intent and malice." *Id.* at 52 (citation omitted). Dougherty counters that

> the Commonwealth did not invoke those reasons, and instead advocated exclusively for the impermissible inference that (1) when women confronted Dougherty about his drinking, he often responded with violence; so (2) it is more likely that when McGovern and Dippel confronted Dougherty about his drinking on August 24, 1985, he responded by starting the fire.

*Id.* Dougherty argues that the testimony was offered to "prove the character of a person in order to show action in conformity therewith, the specific inference prohibited by Rule 404(b)." *Id.* at 52-53 (internal quotation marks omitted).

First, we observe that Dougherty failed to object to the testimony of Dippel on this basis, or the prosecutor's use of McGovern's testimony in his closing argument. Accordingly, those specific arguments are waived. *See* Pa.R.E. 302(a) (stating that an issue cannot be raised for the first time on appeal); *see also Commonwealth v. Baumhammers*, 960 A.2d 59, 84 (Pa. 2008) (stating that "the absence of a specific[,] contemporaneous objection renders [an] appellant's claim waived.") (citation omitted)). We therefore will address Dougherty's preserved claim.

- 26 -

> "Evidence is admissible if it is relevant — that is, if it tends to establish a material fact, makes a fact at issue more or less probable, or supports a reasonable inference supporting a material fact — and its probative value outweighs the likelihood of unfair prejudice." ***Commonwealth v. Boczkowski***, 577 Pa. 421, 846 A.2d 75, 88 (Pa. 2004) (citations omitted). Admissibility of evidence is within the sound discretion of the trial court and we will not disturb an evidentiary ruling absent an abuse of that discretion. ***Commonwealth v. Arrington***, 624 Pa. 506, 86 A.3d 831, 842 (Pa. 2014), ***citing Commonwealth v. Flor***, 606 Pa. 384, 998 A.2d 606, 623 (Pa. 2010)….

***Commonwealth v. Hicks***, 156 A.3d 1114, 1125 (Pa. 2017).

Pennsylvania Rule of Evidence 404(b)(1) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Pa.R.E. 404(b)(1).

> [E]vidence of prior bad acts, while generally not admissible to prove bad character or criminal propensity, is admissible when proffered for some other relevant purpose so long as the probative value outweighs the prejudicial effect." ***Boczkowski***, 846 A.2d at 88. ***See also Arrington***, 86 A.3d at 842, *citing* Pa.R.E. 404(b)(1); ***Commonwealth v. Morris***, 493 Pa. 164, 425 A.2d 715, 720 (Pa. 1981) (law does not allow use of evidence which tends solely to prove accused has "criminal disposition"). Such evidence may be admitted to show motive, identity, lack of accident or common plan or scheme. ***Arrington***, 86 A.3d at 842, *citing* Pa.R.E. 404(b)(2); ***Commonwealth v. Briggs***, 608 Pa. 430, 12 A.3d 291, 337 (Pa. 2011) (Rule 404(b)(2) permits other acts evidence to prove motive, lack of accident, common plan or scheme and identity). In order for other crimes evidence to be admissible, its probative value must outweigh its potential for unfair prejudice against the defendant, Pa.R.E. 404 (b)(2), and a comparison of the crimes proffered must show a logical connection between them and the crime currently charged. ***Arrington***, 86 A.3d at 842.

***Hicks***, 156 A.3d at 1125.

Here, the trial court rejected Dougherty's challenge to the prior bad-acts evidence, reasoning that "[Dougherty's] pattern of alcohol[-]induced violence toward[s] women who had challenged his drinking was clearly admissible to show motive, revenge, intent and malice." Trial Court Opinion, 9/1/16, at 22. When used as evidence of motive, our Supreme Court has explained that,

> [t]o be admissible under this exception, there must be a specific "logical connection" between the other act and the crime at issue which establishes that "the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances." *Commonwealth v. Martin*, 479 Pa. 63, 68-69, 387 A.2d 835, 838 (1978) (quoting *Commonwealth v. Schwartz*, 445 Pa. 515, 522, 285 A.2d 154, 158 (1971)). In *Martin*, for example, thirteen days prior to his murder, the victim had struck the appellant with a chair when the appellant was attempting to rob others. Our Supreme Court determined that this incident constituted a possible motive for the subsequent murder, as "the killing grew out of or was in some way caused by the prior incident." *Id.* at 69, 387 A.2d at 838.

*Commonwealth v. Ross*, 57 A.3d 85, 100 (Pa. 2012). The Supreme Court cautioned, however, that

> [t]he mere identification of similarities between the prior bad acts and the crime at issue, … does not establish motive. Instead, as indicated above, there must be a firm basis for concluding that the crime currently on trial "grew out of or was in any way caused by the prior set of facts and circumstances."

*Id.* at 101 (quoting *Commonwealth v. Martin*, 387 A.2d 835, 838 (Pa. 1978)).

At trial, the Commonwealth presented the following testimony from McGovern, Dougherty's former girlfriend, McGovern:

- 28 -

Q.      [The Commonwealth]:   When [Dougherty] drank, how did he get?  Tell us about his temperament?

[Defense counsel]:   Objection

Q.      Ma'am, tell the ladies and gentlemen of the jury when he drink, his temperament.

A.      [McGovern]:   He would get nasty.

Q.      How would you describe "nasty" ma'am?

A.      Belligerent, mean.  I don't know.

Q.      Would he get physical?

[Defense counsel]:   Objection.

THE COURT:   Overruled.

…

Q.      … [Y]ou described his temperament when he was drinking, but let me ask you this:  What was his temperament when you confronted him about the drinking when he was drinking?

A.      I guess he didn't like it.

Q.      Well, ma'am, we weren't there.  You have to tell us, Ms. McGovern.

Just listen to my question.  You have to tell the ladies and gentlemen of the jury, when he was drinking and you, [McGovern], confronted him, what was his response?

A.      I –

Q.      How did he respond?

A.      He would get mad.

Q.      How did he act?  What was—how did he act?

A.      Mad.

Q.    Okay.   Describe "mad."

Would he get physical when you confronted him about his drinking?

A.    Sometimes.

N.T., 3/23/16, at 11-13.   Over Dougherty's objection, the Commonwealth further confronted McGovern with her statement to police that Dougherty would hit her when she confronted him about its drinking.   **Id.** at 89-90.   In addition, the Commonwealth confronted McGovern about her prior testimony, wherein she stated that Dougherty became "nastier" when drinking.   **Id.** at 94-95.

The above testimony does not establish that the alleged arson "grew out of or was in any way caused by the prior set of facts and circumstances" as to McGovern.   **See Ross**, **supra**.   There is no support for a conclusion that Dougherty's prior actions against McGovern evidenced his intent or malice as to the charge of arson.   There is no evidence that Dougherty previously placed his children in harm's way when intoxicated, or that his violence, when drinking, extended to his children.   Rather, the evidence was offered to show that because Dougherty became violent towards McGovern, who had confronted him about drinking, he was more likely to act in conformity therewith and set a fire and kill his children.   Such use is not permitted under Rule 404(b).   **See** Pa.R.E. 404(b).   Accordingly, the trial

court abused its discretion in admitting the prior bad acts testimony of McGovern.

Where, as here, the cause of the fire was contested, we cannot deem this error harmless. We therefore reverse Dougherty's judgment of sentence on this basis as well, and remand for a new trial.

Finally, Dougherty claims that "[p]rosecutorial misconduct infected the trial and denied Dougherty a fair trial and due process of law." Brief for Appellant at 56. Dougherty claims that during closing arguments, the trial court improperly allowed the prosecutor to give personal and inappropriate opinions as to the credibility of Dougherty's witnesses. *Id.* at 57. In particular, Dougherty claims that the prosecutor compared his fire expert to a charlatan, a prostitute, a three-card monte dealer, and an adulterer. *Id.* at 58.

In its Opinion, the trial court addressed this claim and concluded that it lacks merit. *See* Trial Court Opinion, 9/1/16, at 23-28. We agree with the reasoning of the trial court, as set forth in its Opinion, and affirm on this basis as to Dougherty's sixth claim. *See id.*

For the foregoing reasons, we are constrained to reverse Dougherty's judgment of sentence and remand for a new trial.

Judgment of sentence reversed. Case remanded for a new trial. Superior Court jurisdiction is relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/31/2017

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA : CRIMINAL TRIAL DIVISION
:
:
Vs : 1648 EDA 2016

**FILED**

DANIEL DOUGHERTY : CP-51-CR-0705371-1999

SEP 01 2016

Criminal Appeals Unit
First Judicial District of PA

OPINION

O'KEEFE, J.

Defendant, Daniel Dougherty, appeals the judgment of sentence for arson and the murder of his two children. Dougherty was sentenced to two consecutive life sentences for the second-degree murder convictions as well as a concurrent ten to twenty year incarceration for the arson. The defendant had been originally tried and sentenced to death in 2000 for these offenses. On direct appeal the judgment of sentence was affirmed by the Pennsylvania Supreme Court with the petition for *certiorari* denied by the United States Supreme Court on October 3, 2005. Following the filing of a Post-Conviction Hearing Act petition, the parties agreed to two life sentences in place of the sentences of death. Subsequently, these convictions were overturned due to ineffective assistance of counsel. After retrial, Mr. Dougherty makes several allegations of evidence admitted improperly and prosecutorial misconduct as grounds for his new appeal.

1

## PROCEDURAL HISTORY:

The defendant was arrested and charged with arson, murder and related offenses that had resulted in the death of the defendant's two children, John and Daniel, aged three and four respectively, on July 21, 1999, more than thirteen years after a fire engulfed his girlfriend's residence of 929½ Carver Street in Philadelphia. Mr. Dougherty's first jury trial, in October of 2000, resulted in two convictions of murder of the first degree as well as arson and a sentence of death for each of the two victims. The Pennsylvania Supreme Court affirmed the judgment of sentence on October 20, 2004. *Commonwealth v. Dougherty*, 580 Pa. 183, 860 A.2d 31 (2004). The defendant's petition for *certiorari* was denied by the United States Supreme Court on October 3, 2005. *Dougherty v. Pennsylvania*, 546 U.S. 835, 126 S.Ct. 63, 163 L.Ed.2d 89 (2005).

In November of 2005, the defendant filed a *pro se* petition under the Post-Conviction Relief Act (hereinafter, for the sake of brevity referred to as "PCRA"), with an amended counseled petition filed a year later. In April of 2009, the court dismissed the petition and on April 28, 2011, the Pennsylvania Supreme Court remanded the matter for appointment of a new PCRA judge to develop the record. By agreement of the parties, on February 7, 2012, Dougherty's death sentences were vacated and a new sentences of life imprisonment imposed. Further hearings were conducted on the ineffective assistance of counsel claims and the PCRA court dismissed the petition on September 6, 2012. On December 30, 2013, the Superior Court vacated the PCRA court's dismissal and directed the court to order a new trial.

A new jury trial was held from March 21, 2016 through April 11, 2016, whereupon the jury found Dougherty guilty of two counts of murder of the second degree and arson. The defendant was sentenced to consecutive life sentences for the murders of his two sons and a concurrent sentence of ten to twenty years' incarceration for the arson. It is from this judgment of sentence

2

that the defendant timely appeals.

## STANDARD OF REVIEW:

The standard of review for a claim of inadmissibility of evidence is that the admission of evidence is within the sound discretion of the trial court and will not be reversed absent a showing that the trial court clearly abused its discretion. An abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised was manifestly unreasonable. *Commonwealth v. Handfield*, 34 A.3d 187, 207-08 (Pa.Super. 2011).

When reviewing a claim of prosecutorial misconduct, the inquiry is whether the prosecutor engaged in misconduct and if so, was the unavoidable effect of the prosecutor's actions to prejudice the jury, forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impeding the rendering of a true verdict. *Commonwealth v. Chimel*, 777 A.2d 459, 464 (Pa.Super. 2001); *Commonwealth v. Graham*, 109 A.3d 733 (Pa.Super. 2015).

## FACTS:

The facts, when viewed in the light most favorable to the Commonwealth as the verdict-winner, show that on the evening of August 24, 1985, Daniel Dougherty was supposed to return to his girlfriend's home after attending an Alcoholics Anonymous meeting and tend to his two children, as well as the child of his live-in girlfriend, Kathleen McGovern. (N.T. 3-23-2016 morning session, pp. 18-21). Mr. Dougherty did not go home. At approximately 11:30 p.m., the defendant was in a bar when Ms. McGovern stormed in and angrily confronted him, telling Dougherty to get home with his kids because she was leaving him. (N.T. 3-23-2016 morning

3

session, pp. 21-23). McGovern returned to her Oxford Circle home, packed up some of her belongings and left with her child, leaving the two young Dougherty boys asleep in their second-floor bedroom with a teenage babysitter. (N.T. 3-23-2016 morning session, pp. 23-24). By 1:30 a.m. the babysitter could stay no longer and returned to her residence next door, leaving a note for the defendant explaining to him what had occurred.

Leaving the bar, Dougherty did not go home, but to the home of his estranged wife, the mother of the two children, Kathleen Dippel. (N.T. 3-23-2016 morning session, pp. 107-109). Dougherty pleaded with his estranged wife to come with him and take the children as his girlfriend had kicked him out. (N.T. 3-23-2016 morning session, pp. 21-23). Dougherty got mad at Dippel for not wanting to come with him and get the children in the middle of the night, (N.T. 3-24-2016 afternoon session, p.15-16, 72) and returned home. He did not stay, reappearing at the house of his wife. Dippel finally agreed and came with Dougherty to take custody of the two children. (N.T. 3-23-2016 morning session, pp. 114-115). Once they got to McGovern's house, the defendant asked Dippel to spend the night. (N.T. 3-23-2016 morning session, pp. 121-122). Ms. Dippel declined Dougherty's advances and asked the defendant to bring the children downstairs. Dougherty refused, unceasingly demanding Dippel go upstairs to retrieve the children. (N.T. 3-23-2016 morning session, pp. 122-123). In fear of being sexually assaulted by the defendant, Dippel refused to go upstairs. (N.T. 3-23-2016 morning session, pp. 122-124). Weary of the defendant's advances, Dippel left, barefoot and without the children. Thereafter, Dougherty was the only adult in the house while the children slept upstairs.

At approximately 3:57 a.m., police responded to reports of a fire at the residence. By the time the police responded, the house was in flames and the defendant outside of the house. When asked his name, Dougherty replied, "my name is mud and I should die for what I did." (N.T. 3-

4

22-16 afternoon session, pp. 12, 21). The two boys were subsequently found dead in their upstairs bedroom. The medical examiner concluded that the children died from smoke inhalation and carbon dioxide poisoning and may have been burned while still alive.

The defendant was subsequently questioned by the police. Dougherty told them that after Dippel left, he fell asleep on the sofa, to be awoken by the noise of the fire on the drapes adjacent to the front window. (N.T. 3-24-2016 afternoon session, p. 78).

Dougherty's testimony at his first trial took on a more fearless tone, even reaching super-heroic proportions as he claimed he tried to enter the house twice but was forced out by the intensity of the heat and flames; tried to put the fire out with a neighbor's hose; had a window explode on him and cut him; screamed at people to help him after a cop refused to radio in the house fire, but none would; grabbed a cop and drug him out of his police car and fought him because the cop would not help him; was hit from behind by another cop; and woke up across the street handcuffed to a fence, at which time he tried to rip the fence down, so the police started beating him. (N.T. 3-24-2016 afternoon session, pp. 25-31). Dougherty claims he finally got himself free of the handcuffs and fence and ran into the house. (N.T. 3-24-2016 afternoon session, pp. 31-32). The defendant further testified he got into the house a couple of times. (N.T. 3-24-2016 afternoon session, p. 32). When this failed, Dougherty claims he grabbed the hose again, knocked the neighbor's door down running upstairs at his neighbor's house, punching the wall to break through, but the neighbor child started choking, so Dougherty grabbed the tot and carried him down the steps and outside to safety. (N.T. 3-24-2016 afternoon session, pp. 33-36). Dougherty then testified that he kicked in his kitchen door, filled a big kitchen pot with water and tried to get through the house spreading the water from the pot with a towel, when the dining room ceiling came crashing down on him and he couldn't go any further. (N.T. 3-24-2016 afternoon session, pp. 36-39). At that

5

point the defendant swore he grabbed a ladder attempting to climb it several times, but the force of the flames knocked him off the ladder. (N.T. 3-24-2016 afternoon session, pp. 37-38). He tried again but the ladder fell apart. (N.T. 3-24-2016 afternoon session, pp. 38-39). Dougherty testified that at that point he started losing it and somehow woke up around the front of the house with five cops on top of him, beating him. (N.T. 3-24-2016 afternoon session, pp. 39-41). They again hand-cuffed him, this time to the neighbor's railing at which he flipped out, ripped the railing out of the steps and then picked up and threw the cop. (N.T. 3-24-2016 afternoon session, pp. 41-42). Dougherty testified that he then had another fight with the cops around the corner, bringing the count to three separate fights with the police: the first with two officers after yanking one officer out of his patrol car, the second with five cops, and the third time with an unknown number of policemen. (N.T. 3-24-2016 afternoon session, pp. 42-44). Finally Dougherty contends he was put in a patrol car and taken to JFK hospital, where the doctor stated that he needed stitches but Dougherty, ever self-reliant, refused them. After that, the defendant claims the police took him out of the hospital, but he doesn't know what happened after that. (N.T. 3-24-2016 afternoon session, pp. 44-45). Despite all of this, there were no burns, smoke, soot or ash on the person of the defendant. Dougherty's own expert testified that none of these things occurred.

Lt. John Quinn was an Assistant Philadelphia Fire Marshall who investigated the fire the morning of the deaths. Although he testified at the first trial, he was unavailable for this retrial, and his prior testimony was read to the jury. Lt. Quinn opined, to a reasonable degree of scientific certainty, that the fire was of incendiary origin and intentionally set. The Assistant Fire Marshall determined that there were three points of origin – the love seat, the sofa, and under the dining room table. The lieutenant noted that Dougherty's claim to have been on the sofa when the fire broke out on the front curtains was incredulous in that the sofa would have been fully consumed

6

before the curtains were set ablaze and that anyone on that sofa when the drapes caught fire would have been either severely burned or a fatality. The testimony was likewise crystal clear that the defendant had not suffered any burns and his body did not show any mark of exposure to smoke or fire. Quinn further testified that only the person who set the blaze would have had time to escape the burning house.

Capt. Thomas Schneiders is a fire investigator, having previously been a firefighter since 1972 for the City of Philadelphia, promoted to lieutenant and then to investigator for the Fire Marshall's Office for five and a half years before being promoted to Captain. (N.T. 3-28-2016 morning session, pp. 6-17). Capt. Schneiders testified to a reasonable degree of scientific certainty that there had been three points of origin at the Carver Street house and that the cause of the fire was arson. This expert further testified to the effects of full room involvement and 'flashover', but concluded to a reasonable degree of scientific certainty, in agreement with Lt. Quinn, that there were three points of origin of the fire, that it was of incendiary origin, and was intentionally set.

Defense expert, John Lentini, claimed that the Carver Street house fire was a compartment fire and consequently, as the heat builds up it forms a layer of smoke and heat which when the room is completely consumed 'flashover' occurs, and that in such a case it would be impossible to determine the point or points of origin of a fire. Although Lentini never viewed any of the physical evidence, he did examine Quinn's pictures of Carver Street as well as the lieutenant's interviews with the defendant, firefighters and police present during the fire. Lentini could not determine if the cause of the fire was accidental or arson, merely that the cause would have to have been classified as undetermined.

On April 11, 2016, the jury returned a verdict of guilty of two counts of murder of the second degree and arson. Mr. Dougherty was sentenced to two consecutive life sentences.

7

## LEGAL DISCUSSION

### *Motion to Dismiss*

Prior to trial, Dougherty filed a motion to dismiss, or in the alternative for a *Frye*[1] hearing, claiming that the methodology employed by the Commonwealth's witness, Assistant Fire Marshall Lieutenant John Quinn, failed to satisfy the standards for expert testimony. During the PCRA hearings two witnesses expressed their opinion that because of phenomena known as 'flashover' and 'full room involvement' no one could make a determination as to the cause of the fire. These defense experts cannot say that the cause was not arson, just that it had to be classified as undetermined. The defendant further alleges that since Quinn did not specifically mention the terms 'flashover' and 'full room involvement' during Dougherty's first trial, that he must have been ignorant of such phenomena. The defense concluded that as Quinn was unavailable to testify in the retrial and the prosecution had no other expert, the charges should have been dismissed pretrial, or alternatively a *Frye* hearing conducted.

First and foremost, the Commonwealth had another expert who authored a report and testified at the retrial, Captain Thomas Schneiders, a former Philadelphia Firefighter, Captain of the Philadelphia Fire Department, Assistant Fire Marshall for the City of Philadelphia, and currently a fire investigator in private practice. Captain Schneiders identified three points of origin and affirmed the methodology employed by Lieutenant Quinn at the fire scene on the night of the conflagration. In as much as the defendant based his motion to dismiss on the theory that the prosecution had no other expert to testify, his motion was properly denied. Captain Schneiders opined to a reasonable degree of scientific certainty that the evidence indeed did allow him to

---

[1] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)

8

pinpoint three points of origin of the fire in the Carver Street address, that he was familiar with full room involvement and flashover and that Quinn's method and analysis of the scene was in accord with accepted fire-investigative procedures and within the National Fire Protection Association (NFPA) standard of care for conducting fire investigations.

As to the alleged error of failing to hold a *Frye*[2] hearing, the defendant's position is that the two PCRA defense witnesses concluded that Lt. Quinn did not consider the effects of full room involvement or flashover because he did not specifically mention them in his prior testimony and therefore his methodology was not accepted in the fire science community. Dougherty contends that as the Superior Court found prior trial counsel ineffective for failing to hire or consult a fire expert to familiarize himself with the concepts of flashover and full room involvement that Fire Marshall Quinn's methodology and conclusions must have been deficient, and as a result a pretrial *Frye* inquiry is required.

The Commonwealth countered that both defense experts agreed during the PCRA hearing that Lt. Quinn was an expert and they had no reason to question his experience as a Fire Marshall. (N.T. 10-2-2000, p. 183). Additionally, the prosecution rebuts Dougherty's motion contending that *Frye* is only applicable where proposed scientific evidence is novel and therefore an inquiry is required to determine whether the new methodology has gained acceptance in the field. The prosecution argues that what the defendant is really requesting is a *Daubert*[3] hearing, a practice which the Pennsylvania Supreme Court has refused to adopt. *See Grady v. Frito-Lay*, 576 Pa. 546, 839 A.2d 1038 (2003). Under *Frye*, "novel scientific evidence is admissible if the methodology that underlies the evidence has general acceptance in the relevant scientific community." *Grady v.*

---

[2] *Frye* was adopted in Pennsylvania in *Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (Pa. 1977).
[3] *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.ed.2d 469 (1993)

*Frito-Lay, Inc.*, 576 Pa. 546, 555; 839 A.2d 1038, 1043-44 (Pa. 2003). *Daubert*, on the other hand, held that the enactment of the Federal Rules of Evidence implicitly overturned *Frye* and did not limit itself to whether the proffered evidence was novel, but instead required that the evidence is both relevant and that it rests on a reliable foundation.

When qualifying an expert witness, the test to be applied is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine. *Miller v. Brass Rail Tavern, Inc.*, 541 Pa. 474, 480-81, 664 A.2d 525, 528 (1995).

Despite Dougherty's previous acquiescence in Quinn's expertise, the defendant now claims that the methodology used by Lt. Quinn was not up to today's standards of fire investigation, based upon their assertion that since Quinn did not mention the phenomena of full room involvement and flashover in Dougherty's first trial, it must follow that Quinn was unaware of those concepts.[4] The defendant's reasoning is flawed. Neither the Superior Court, nor the PCRA Court found that Quinn's methodology or expertise was lacking. The issue previously litigated was trial counsel's unpreparedness to cross-examine or to counter Quinn's testimony which comprised the most compelling evidence against the defendant.

Quinn, a former Fire Marshall with twenty-three years' experience in fire investigation, started this investigation within a half hour of the fire's inception. He examined the premises, interviewed the firefighters on the scene, in addition to the defendant, the only resident of the house to make it out alive. Quinn examined and photographed the entire house including the fire patterns

---

[4] Interestingly, the expert Dougherty cites to question Quinn's methodology was John Lentini, who repeatedly testified that he approaches every case with an expectation bias that the fire is accidental unless proven otherwise, in violation of the National Protection Fire Association's directives as well as the scientific method. (N.T. 3-29-2016 morning session, pp. 4, 38-48).

on the walls, eliminated the possibility of an accidental fire by examining the electrical outlets, the gas meter, the fuse box, the heater in the basement, along with the kerosene can. He refuted the possibility of careless smoking as a cause and disproved the defendant's account of events. Based on all of this, Lt. Quinn came to the conclusion that the fire was intentionally set and that there were three points of ignition. Not mentioning flashover or full room involvement because he was not cross-examined about such phenomena does not mean that Quinn didn't know of these concepts, just that he wasn't asked about them. The PCRA court found that these theories would have been part of any knowledgeable cross-examination, not that Quinn did not know about them. Quinn and Schneiders both opined that there were three points of origin and as such the fire was intentionally set. Lentini contends that because of flashover we can't know where the fire started. However, Lentini could not adequately explain the burn patterns on the wall, the excessive charring under the dining room table but not the top of the table, the chimney effect of the staircase or several other facts that negate his theories. Defense Expert Angelo Pisani testified at the PCRA hearing that he was unable to state that the burn patterns observed by Lt. Quinn had been altered by flashover and that Quinn had an advantage in evaluating those burn patterns as he was the investigator who personally observed them, rather than viewing them through photographs. (N.T. 3/9/2012 pp. 167, 172, 175). Clearly this is a case of dueling experts who have come to two different conclusions based upon the evidence, thus, a matter of what weight to be given to either expert's conclusion, an issue to be resolved by the trier of fact.

### *Prior Expert Testimony*

The defendant next submits that the trial court impermissibly allowed Quinn's prior testimony to be read to the jury, violating the defendant's right of confrontation as well as due process. The crux of this complaint is that since the Superior Court found prior counsel ineffective in failing

to either retain a consulting or testifying expert in fire science, that the defendant did not have a full and fair opportunity to cross-examine the Commonwealth's expert and as such his testimony should be barred.

Prior recorded testimony is admissible in Pennsylvania pursuant to Pennsylvania Rule of Evidence 804(b)(1) if the declarant is unavailable and if the testimony:

> "(A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and
> (B) is now offered against a party who had – or, in a civil case, whose predecessor in interest had – an opportunity and similar motive to develop it by direct, cross-, or redirect examination."
> Pa.R.E. 804(b)(1).

The Sixth Amendment guarantees criminal defendants the right to confront and cross-examine adverse witnesses, to ensure a fair and reliable trial. U.S. Const. Amend. VI; *Commonwealth v. Laird*, 605 Pa. 137, 988 A.2d 618 (2010); *Commonwealth v. Overby*, 570 Pa. 328, 337, 809 A.2d 295, 300 (2002). The prior testimony of the presently unavailable witness may be used where the party against whom the testimony is offered had an adequate opportunity and similar motive to develop the testimony. *Commonwealth v. Laird*, 605 Pa. 137, 988 A.2d 618 (2010); *Commonwealth v. Bazemore*, 531 Pa. 582, 588, 614 A.2d 684, 687 (1992); *Commonwealth v. Paddy*, 569 Pa. 47, 78, 800 A.2d 294, 313 (2002). The question to be decided when determining whether or not to admit prior recorded testimony is whether or not the defendant had a full and fair opportunity to cross-examine that witness at the prior hearing. *Commonwealth v. Bazemore*, 531 Pa. 582, 614 A.2d 684 (1992); *Commonwealth v. Chmiel*, 558 Pa. 478, 738 A.2d 406 (1999).

Dougherty never challenged the unavailability of Lt. Quinn. The defendant's complaint is that since his prior attorney was found to be ineffective because counsel failed to properly and thoroughly investigate the phenomena of full house involvement and flashover, there was not a

full and fair opportunity to cross-examine Lt. Quinn, and therefore Quinn's testimony should have been excluded at the retrial. Dougherty cites *Commonwealth v. Mangini*, 493 Pa. 203, 425 A.2d 734 (Pa. 1981)[5] as controlling precedent for this proposition. Again, the defendant's reliance is misplaced. In *Mangini*, the court found that the testifying witness was incompetent and that on retrial the same testimony from the same incompetent individual should have been prohibited. The reason was simple, the witness himself was incompetent and that incompetence could not be rede-termined at the retrial. Such is not the scenario with which this court was faced. There is no *per se* rule requiring the exclusion of testimony from a prior trial where the attorney has been found ineffective. *Commonwealth v. Mangini, supra.*; *Commonwealth v. Laird*, 605 Pa. 137, 988 A.2d 618 (2010); *Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294 (2002).

Dougherty also relies on *Commonwealth v. Bazemore*, 531 Pa. 582, 614 A.2d 684 (1992), to support his allegations. In *Bazemore*, the Pennsylvania Supreme Court determined that the defendant was not given a full and fair opportunity to cross-examine the witness at the preliminary hearing because the prosecution did not provide counsel with a prior inconsistent statement at or before the hearing. There is no allegation that this defendant's counsel did not have all discovery and *Brady* material prior to trial. Accordingly, Dougherty's reliance on *Bazemore* is misplaced. For all of the above reasons, it was proper to admit the prior testimony of Lt. Quinn.

## *Photographs*

Defendant next asserts that it was error to allow the Commonwealth to publish to the jury a single photograph of the burned bodies of the two children in their bed. In Pennsylvania, the admission of photographs is within the discretion of the trial court and will only be disturbed on a

---

[5] Dougherty also relies on *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) although *Roberts* was specifically overruled by *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

13

showing of an abuse of that discretion. *Commonwealth v. Tharp*, 574 Pa. 202, 830 A.2d 519 (2003); *Commonwealth v. Strong*, 522 Pa. 445, 563 A.2d 479 (1989); *Commonwealth v. Woods*, 454 Pa. 250, 311 A.2d 582, 583 (1973). First, the court must determine if the photograph is inflammatory. If inflammatory, the trial court must decide if the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. *Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367 1373-74 (1991) *cert. denied*, 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 422 (1991); *Commonwealth v. Tharp*, 574 Pa. 202, 830 A.2d 519 (Pa. 2003); *Commonwealth v. Pruitt*, 597 Pa. 307, 951 A.2d 307, 319 (2008); *Commonwealth v. Solano*, 588 Pa. 716, 906 A.2d 1180, 1191 (2006).

> "A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt."

*Commonwealth v. McCutchen*, 499 Pa. 597, 454 A.2d 574, 549 (1982).

Prior to the jury being shown the photograph, the jury was given the following cautionary instruction:

> "Ladies and gentlemen of the jury, photos are about to be put in evidence for the purpose of showing conditions of the scene as well as to help you understand the testimony of the witnesses who refer to it.
>
> I will warn you, they are not pleasant to look at; however, you should not let it stir up emotions to the prejudice of the defendant. Your verdict must be based on a rational and fair consideration

14

of all the evidence and not on passion or prejudice against the defendant, the Commonwealth, or anyone else connected with this case." (N.T. 3-24-2016 morning session, pp. 119-120).

Photographic evidence depicting a murder victim is not *per se* inadmissible in Pennsylvania, rather the admissibility of those photographs involves a two part analysis. First, the court must determine if the proposed photograph is inflammatory, and if so, then the court must balance whether the photo is of such essential evidentiary value that its need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. *Commonwealth v.Ballard*, 622 Pa. 177, 198, 80 A.3d 380, 393 (2013); *Commonwealth v. Eichinger*, 591 Pa. 1, 915 A.2d 1122, 1142 (2007); *Commonwealth v. Marshall*, 537 Pa. 336, 643 A.2d 1070, 1074-75(1994).

The defense strategy in the present case was to attack the Commonwealth's expert's determination that there were three points of origin of the fire, and to propose that because of the phenomena of flashover and full room involvement, it was impossible to determine the cause of the fire. Inherent with that theory is that intense smoke and heat that would have risen up through the house. The Commonwealth's experts explained that the staircase, which was part of the room set ablaze, would have acted like a chimney, and with the severe heat rising in the room, the amount of heat and smoke going up the staircase would have been considerable. The photograph of the two children on the bed depicts one of the children wearing pullups which were still white and the other child wearing a diaper with the plastic still intact, negating the defense expert's hypothesis. If the extreme heat required by the defense was present, it would be expected that the plastic diaper would have melted and the white pullup would have been grey at best. Clearly the photograph was a necessary element for the Commonwealth to debunk the defense expert's explanation. Thus, the probative value of this evidence is unequivocal.

15

The photo in question depicted the two children, lying face down on the bed. As previously noted, the photograph was indispensable for the Commonwealth to show the condition of the children's clothing at the time of their death in order to disprove the defense expert's premise. Of the several photographs, the only one admitted was the one depicting the clothing of the children, crucial for the prosecution's refutation of the defense's hypothesis. The jury was only permitted to view the one photo, one time, for a very brief moment, and not permitted to take the photograph into the deliberation room. The jury was cautioned prior to the photograph being exhibited in an attempt to partially sanitize the inflammatory nature of the picture. Clearly the court did not abuse its discretion in allowing a single photograph of the children where its probative value clearly outweighed the prejudice.

## *Defendant's prior bad acts*

Dougherty next charges that the trial court erred in allowing the prosecutor to argue and elicit testimony from the defendant's estranged wife, as well as his then girlfriend concerning his prior abuse of those witnesses when he drank.

"The admissibility of evidence is a matter addressed to the sound discretion of the trial court and an appellate court may only reverse rulings on admissibility upon a showing that the lower court abused its discretion." *Commonwealth v. May*, 540 Pa. 237, 248, 656 A.2d 1335 (1995).

Pennsylvania Rule of Evidence 404(b) regulates when evidence of other crimes, wrongs or other acts may be admitted at trial. Ordinarily, evidence that a person committed other crimes, wrongs or acts is inadmissible for the purpose of showing a propensity or disposition to behave in

16

a similar fashion. However, the probative value of such acts may outweigh the presumptive prejudice if there is a close factual nexus sufficient to demonstrate the connective relevance of the prior bad act to the crime in question. *Commonwealth v. Kjersgaard*, 276 Pa.Super. 368, 419 A.2d 502, 505 (1980); *Commonwealth v. Ross*, 57 A.3d 85 (Pa.Super. 2012) (*en banc*). Classic rationales for the admission of other crimes or bad acts evidence include using this evidence to prove identity, motive, intent, malice, absence of mistake or accident, common plan, scheme or design, and where the prior or subsequent act is a part of the history of the event or part of the natural development of the facts. Pa.R.E. 404(b)(2); *Commonwealth v. Schwarz*, 419 Pa. Super. 251, 615 A.2d 350 (1992); *Commonwealth v. Williams*, 307 Pa. 134, 160 A. 602 (1932); *Commonwealth v. Brown*, 462 Pa. 578; 342 A.2d 84 (1975); *Commonwealth v. Mayhue*, 536 Pa. 271, 639 A.2d 421 (1994); *Commonwealth v. Barger*, 742 A.2d 477 (Pa. Super. 1999). Such evidence may only be admitted upon a showing that the probative value of the evidence outweighs its potential for prejudice.

Dougherty specifically protests the following direct examination of Kathleen McGovern, the defendant's then live-in girlfriend:

> "Q. What were the problems that developed in the relationship?
> A. Drinking.
> Q. Whose?
> A. Danny's drinking.
> Q. When the defendant drank, how did he get?
> Tell us about his temperament.
>      Ms. Farmer: Objection.
>      By Mr. Conroy:
> Q. Ma'am, tell the ladies and gentlemen of the jury when he drank,
> his temperament.
> A. He would get nasty.
> Q. How would you describe "nasty" ma'am.
> A. Belligerent, mean. I don't know.
> Q. Would he get physical?
>      Ms. Farmer: Objection.
>      The Court: Overruled.

The Witness: Sometimes.

By Mr. Conroy:

Q. Did it get to the point, Ms. McGovern, where you left the defendant? Or what happened as a result of the drinking and his behavior?

A. I told him I was leaving"

(N.T. 3-23-2016 morning session, pp. 10-11).

And later on:

Q. Counsel asked you the question, well, you had confronted the defendant before that night about his drinking, right? Do you remember counsel asking you that question?

A. Yes.

Q. And you confronted him that night in the bar, right?

A. Yes.

Q. There was no reaction from him that night in the bar?

A. Yes.

Q. She asked you that, and he didn't say anything to you, right?

A. Right.

Q. He didn't curse you, cuss you, attempt to be assaultive when you confronted him that night about his drinking, right –

A. Yes.

Q. –in the bar?

A. Yes.

Q. But, Ms. McGovern, that wasn't always the case, right? You were in a public place, in a bar with other people, right?

A. Yes.

Q. But when you were not in a public place, when it was a private setting, maybe at home, there was a different reaction, wasn't there?

Ms. Farmer: Objection.

The Court: Overruled.

By Mr. Conroy:

Q. And you spoke to – four days, five days after this to Detective Al Lory about, in those private settings, when you would confront him about his drinking?

Mr. Conroy: I will go, counsel, to the question on Page 4, the question above the one you asked.

By Mr. Conroy:

Q. See if you remember this question and answer:

Question: How does Dan act when he gets drunk?"

Do you see that?

A. Yes.

Q. See if you remember this?

"Answer: when I get on him about drinking, he gets mad. He has hit me, too, for the same thing" –

Ms. Farmer: Objection.

The Court: Overruled.
By Mr. Conroy:

Q. "If I leave him alone, he's all right."
   Right, ma'am? Do you see that answer?
A. I do.
Q. Did you give that answer to the detective?
A. Yes.
(N.T. 3-23-2016 morning session, pp.88-90).

And again:

Q. Ma'am, so would it be fair to say, ma'am, that although the defendant didn't have a reaction that night in the Ashburner, that when you confronted him with his drinking problem, that he would get violent with you?
   Isn't –is that fair to say, ma'am?
   Just answer truthfully, ma'am.
A. Yes.
(N.T. 3-23-2016 morning session, p. 95).

Additionally, the defendant's abusive conduct while drunk was brought up on cross-examination of the defense expert:

Q. Sir, sir, in addition, in addition, sir, in addition to knowing that Ms. Schuler packed her 8-year-old and moved out of dodge at midnight, you also know that when she – when the defendant drank, he was violent and assaultive to her, right, sir?
A. Right.
Q. Okay.
   And you – she told the jury that when I confronted him about his drinking, he becomes violent towards me. You know that sir?
A. Yes. And that has nothing to do with three points of origin."…

Q. …But, sir, you would agree with me that she confronted him in a bar that night and said, get the fuck home, I'm leaving. Didn't she, sir?

A. She did.
Q. In a bar full of people, right?
A. Yes.
Q. So he couldn't be physically violent, as he was to her that night in the bar, right, sir?
A. I'm sorry. I'm not even going there. This is outside my expertise.
Q. Sir, you also know – you also sat in a courtroom when his wife testified, Kathleen Dougherty, right?
A. Correct.

19

Q. Who he was repeatedly assaultive to, correct, sir?

A. Yes.

Mr. Fryman: Your Honor, objection. It's outside the scope.

Mr. Conroy: Well –

The Court: Overruled.

By Mr. Conroy:

Q. Sir, and you also know, sir, that he got her up at, you know, in the middle of the night to come get her kids, right?

A. That's what happened, yes.

Q. Right.

And he did that, according to his testimony in 2000, right, sir?

A. So he wanted her to take the kids away. He didn't want to kill the kids.

Q. Well, how do you know that?

A. That's what he asked her to do, to take the children away. That doesn't sound like he wants to kill the children.

Q. Well sir, did you read all of his testimony?

A. Yes, I did.

Q. Okay.

Well, why did he go in the middle of the night to have her come back and take the kids?

A. He wanted her to take the kids.

Q. Right.

And, sir, you understand that she didn't want to get the kids why? Tell us why she didn't want to get the kids.

A. She was afraid of him.

Q. Why was she afraid of him, Mr. Lentini?

A. She was afraid that he might force himself on her.

Q. And what do you mean by that, Mr. Lentini?

A. Rape her.

Q. Rape her, exactly.

A. That's what she said she was afraid of.

Q. Right.

So we know that when the defendant drinks, right, you know he gets violent?

A. This has nothing to do with the physical evidence at that fire scene.

Q. Well, your book 921 tells me motive is important, revenge is important. This is your book, not mine. I didn't read this until –

A. My book is called Scientific Protocols for Fire Investigations.

Q. Oh, well, let's talk about 921, which you've been up here waving the flag of, right? I just read from, revenge fire setting."

(N.T. 3-29-2016 afternoon session, pp. 65-68).

20

It should be noted that the only objection raised in the last cited transcription was that the cross-examination exceeded the scope of the direct examination.

The admission of evidence is within the sound discretion of the trial court and will not be reversed absent a showing that the trial court clearly abused its discretion. An abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised was manifestly unreasonable. *Commonwealth v. Handfield*, 34 A.3d 187, 207-08 (Pa.Super. 2011). The scope of cross-examination is addressed by Pennsylvania Rule of Evidence 611(b) which states:

> "Cross-examination of a witness other than a party in a civil case should be limited to the subject matter of the direct examination and matters affecting credibility, however, the court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." Pa.R.E. 611(b).

Precedent is unmistakable: "Cross-examination may be employed to test a witness' story, to impeach credibility, and to establish a witness' motive for testifying. The scope of cross-examination is a matter within the discretion of the trial court and will not be reversed absent an abuse of that discretion. *Commonwealth v. Chmiel*, 585 Pa. 547, 889 A.2d 501, 527 (2005). *Commonwealth v. Ballard*, 622 Pa. 177, 80 A.3d 380 (2013). Any witness may be impeached by showing the witness' partiality or prior inconsistent statements, in accordance with Pa.R.E. 607 and Pa.R.E. 608.

Mr. Lentini was offered as an expert in the field of fire investigation who opined on the acceptable manner of investigating a fire. He concluded that in this case, he could not determine the cause or origin of the fire. Lentini concluded that not only was he unable to know if the fire was arson or accidental, but that no one else would be able to make that determination either. This witness authored a book which identified, amongst other things, revenge fire setting. It was clearly relevant for the prosecution to elicit that Dougherty got violent with both his wife as well as his

girlfriend when he was drinking. On the night in question, after drinking, he had arguments with both of these women. The defense expert identifies revenge fire setting in his book as well as on his website, and avers that this is a consideration when conducting fire investigations. It was relevant and material to examine Mr. Lentini concerning these subjects, as this went to the credibility and weight of Lentini's conclusions. Accordingly, it was appropriate to allow the prosecution to cross-examine the defense expert even though technically beyond the scope of direct testimony.

Dougherty's 1925(b) claim that the court erred in allowing the selected testimony of the defendant's prior violence towards his wife and girlfriend, although not identified as a reason for the objection, fails as well. The defendant's pattern of alcohol induced violence toward women who had challenged his drinking was clearly admissible to show motive, revenge, intent and malice. See *Commonwealth v. Counterman*, 553 Pa. 370, 719 A.2d 284 (1998) (wherein the defendant's use of marijuana provoked fights with his wife, ending with the defendant setting fire to his house); *Commonwealth v. Lilliock*, 740 A.2d 237 (Pa.Super. 1999) (Defendant's abuse of his wife admissible to show his ill will, malice, and motive for arson. Thus, this claim must be denied.

### *Prosecutorial Misconduct – Questioning defense Expert*

Next, the defendant claims that the trial court erred in allowing the prosecutor to engage in inflammatory and improper questioning of defense expert John Lentini. Dougherty cites one example, the transcript of which reads as follows:

> Q. But you wanted to make sure that before you came in here and testified, you wanted to make sure, John Lentini can say, I got out there and I looked at that Philadelphia, beautiful city row house, didn't you, sir?
> Mr. Fryman: Objection, Your Honor, to his tone with the witness.
> The Court: I'll sustain.

22

By Mr. Conroy:
Q. Are you okay with my tone, Mr. Lentini? You're okay, right?
You can handle it.
A. You're screaming.
Q. Okay.
Do you want me to tone it down a little?
A. I would love it if you talked in a civil tone.
Q. Absolutely.
(N.T. 3-29-2016 afternoon session, pp. 82-83).

The record is clear that when defense counsel objected, this court sustained the objection and the prosecutor adjusted his tone appropriately. No motion for a mistrial was made, and as such there is no basis for relief. *Commonwealth v. Berrios*, 495 Pa. 444, 434 A.2d 1173 (1981); *Commonwealth v. Glenn*, 459 Pa. 545, 330 A.2d 535 (1974). As such this issue is without merit.

*Prosecutorial Misconduct – Closing Argument.*

Dougherty cites several instances alleging that the court further erred by allowing the prosecutor to make inflammatory and improper remarks about the defense expert during his summation. The complained of portions of the closing argument are as follows:

Ladies and gentlemen, what happened here? What happened here? Counsel seems to forget some of the facts. The defendant was married to Ms. Dippel. They had a relationship where she had a drug problem, he had an alcohol problem. And when she confronted him, what did he do? He would beat her. He would beat her.

What then happens? He moves on from goes to Kathleen McGovern.

The story continues with Daniel Dougherty.

"I left him."

"Why?'

"Because he would drink."

"And then what would happen?"

"He would become violent."

"What would he do when he drank and you confronted him?"

"He would become violent."

And, ladies and gentlemen, remember I confronted her, and she was nice, demeanor. I looked her in the eye on the last questions.

23

By Mr. Conroy:
Q. Are you okay with my tone, Mr. Lentini? You're okay, right? You can handle it.
A. You're screaming.
Q. Okay.
Do you want me to tone it down a little?
A. I would love it if you talked in a civil tone.
Q. Absolutely.
(N.T. 3-29-2016 afternoon session, pp. 82-83).

The record is clear that when defense counsel objected, this court sustained the objection and the prosecutor adjusted his tone appropriately. No motion for a mistrial was made, and as such there is no basis for relief. *Commonwealth v. Berrios*, 495 Pa. 444, 434 A.2d 1173 (1981); *Commonwealth v. Glenn*, 459 Pa. 545, 330 A.2d 535 (1974). As such this issue is without merit.

### *Prosecutorial Misconduct – Closing Argument.*

Dougherty cites several instances alleging that the court further erred by allowing the prosecutor to make inflammatory and improper remarks about the defense expert during his summation. The complained of portions of the closing argument are as follows:

Ladies and gentlemen, what happened here? What happened here? Counsel seems to forget some of the facts. The defendant was married to Ms. Dippel. They had a relationship where she had a drug problem, he had an alcohol problem. And when she confronted him, what did he do? He would beat her. He would beat her.

What then happens? He moves on from goes to Kathleen McGovern.

The story continues with Daniel Dougherty.
"I left him."
"Why?"
"Because he would drink."
"And then what would happen?"
"He would become violent."
"What would he do when he drank and you confronted him?"
"He would become violent."

And, ladies and gentlemen, remember I confronted her, and she was nice, demeanor. I looked her in the eye on the last questions.

I asked her, "Ma'am, you had, I think, it was a shaky relationship, volatile. Ma'am, answer my question. What would he do when you confronted him about his drinking?"

"He would beat me." He would beat her, too."

(N.T. 3-31-2016 Commonwealth Closing, pp. 6-8).


Later on:

But something's changed. He's got to get Kathy Dippel, his wife, to come back, to take the kids now.

What changed? He's going to fix this. McGovern confronted him in the bar. He's got beer muscles. He's a boozer. You got a flavor of him. He's not a friendly drunk. We know these two women, involved with him for extended periods, when he boozes, no, he's violent. He gets violent, especially against women when they don't do what he wants them to do. When they confront him on his drinking, he gets violent. Kathy McGovern confronted him and left in the middle of the night with her eight-year-old, speaks volumes of her.

(N.T. 3-31-2016 Commonwealth Closing, pp. 12-13).


A while later:

Well, what do we know? What do we know about this man? It began very quickly and easily. Do you have an expectation bias? He's on the stand very early on, put his hand on the Almighty Bible. "I swear to tell the truth."

"Do you have an expectation bias? That is, do you go into every scene assuming it's an accident, which is in violation of the scientific method?"

I think his words were: "I put a speed bump in the scientific method that dates back to 400 B.C. I put a speed bump."

"Well, do you come in, Mr. Lentinti, with that presumption?"

"No." He said, "No, I don't have that expectation. I don't go in with that." – as he described – "expectation bias. I don't go in with that."

Really? Really? Really? This is the first question out of the box to this man.

"Well, did you ever testify in any other proceeding?"

"I don't know what you are talking about."

"Well, did you testify in Commonwealth versus McCloud up in New Hampshire?"

"Yes."

24

"Okay. See if this is familiar. But you, in your book, actually acknowledge" – he wrote a book, this guy. He wrote a book, and he looked you in the eye and said, "No, I don't have any bias."

"In your book" – this is new. I am sure we didn't know about this. We weren't provided this. We did research on this guy.

"You, in your book, actually acknowledge that you start every case with an expectation bias." When I read that question to him, his answer, ladies and gentlemen, if you recall is "No."

"Okay. Let me read what you said in New Hampshire: 'I do.'"

He says, "Well, that's a mistake. That's a little bit of a mistake."

Ladies and gentlemen, he put his hands on the Bible up there and said something, testified under oath. Now he comes here and this doesn't count. This doesn't count. This is disgraceful. This is lying. This is perjurous. Right from the gate this is what you got from this man. He says, "I was wrong."

I said, "See if the rest of the sentence is wrong: 'I start every case with the expectation that a fire is an accident because most fires are an accident.'

"Question: Right. And you actually write this in your book: 'It is in this author's view, approaching fire investigation without a presumption is an error, right?

"Answer: That's my view."
(N.T. 3-31-2016 Commonwealth Closing, pp. 29-31).


Afterward:


And then what else does he show us? He talks to us about Lime Street. Well, Lime Street, they just showed you Lime Street. Flashover, gases, down. If I think about "Dante's Inferno," that's what I figure. I read that. Hell rain of fire, the fires. So we have even burning here right. That is what this is, what the alchemist is peddling to you, this uniform burning.

But the best is, the best of this is, "Well, in Lime Street, we have a staircase, just like Carver Street. I got a staircase."

Wait a minute, Mr. Lentini, wait one minute now. Staircase? Where is that staircase, Mr. Lentini? In the room where the fire is? No, it's in the other room behind the wall. Oh, okay.

Well, dude, this guy is like somebody playing three card monte on Chestnut Street. This is a joke. If two kids didn't die, it would be laughable and incredible. A prostitute on Kensington Avenue can walk with their head higher than he can because he masks himself as a scientist, as an expert, and will say anything.
(N.T. 3-31-2016 Commonwealth Closing, pp. 42-43).

25

And finally:

> Excuse me.  See, ladies and gentlemen, don't let your ears
> be deceived.  Don't let your ears be deceived by what your eyes see.
> This guy is like the guy in bed with a girlfriend when his
> wife walks in –
> > Mr. Fryman:  Objection.
> > The Court: Overruled.
> > Mr. Conroy: "Yo, Honey.  Who do you believe? Me
> or those lying eyes of yours?"
> We are from Missouri.  Show me.  Mr. O'Brian will say,
> "Harken to the evidence."  Follow the evidence."
> (N.T. 3-31-2016 Commonwealth Closing, p. 56).

First, there was no objection raised to most of the complained of closing and accordingly any allegation of error is waived.  Pa.R E. 103; *Commonwealth v. Adams*, 628 Pa. 600, 104 A.3d 511 (2014); *Commonwealth v. Molina*, 33 A.3d 51 (Pa.Super. 2011).

Addressing the issue on its merits, it has long been the law in Pennsylvania that prosecutors have considerable latitude during closing arguments and are permitted to comment on the evidence or appropriate inferences to be drawn from the evidence, and in the process, to employ oratorical flair. *See Commonwealth v. Kennedy*, 598 Pa. 621, 959 A.2d 916, 923 (2008) (prosecutor did not engage in improper argument by twice referring to defendant as a homicidal predator); *Commonwealth v. Holley*, 945 A.2d 241, 250 (Pa. Super. 2008).

Remarks made by a prosecutor during summation must be examined within the context of defense counsel's conduct since it is well settled that a prosecutor may fairly respond to points made by the defense. *Commonwealth v. Chmiel* 585 Pa. 547, 889 A.2d 501 (2005).  Furthermore, comments by a prosecutor do not warrant judicial relief unless the unavoidable effect of those comments is to prejudice the jury, forming in the jurors' minds a fixed bias and hostility toward the defendant such that they could not weight the evidence objectively and render a fair verdict.

26

*Commonwealth v. Tedford*, 589 Pa. 639, 960 A.2d. 1, 33; (2008); *Commonwealth v. Rios,* 591 Pa. 583, 617, 920 A.2d 790, 809 (2007).

Prior to the presentation of opening statements by counsel, the jury was instructed:

> "[A]s I told you earlier, you are the sole judge of the facts and the credibility and the weight of the evidence. You must rely on your own recollection and evaluation of the evidence during your deliberations, not counsels' or mine. You are not bound by any opinion counsel or I may express about the guilt or innocence, credibility or weight of the evidence, facts proven by the evidence, or inferences to be drawn from the facts.
>
> You should consider the statements and arguments of counsel carefully even though they are not binding on you and are not evidence. You may be guided by them if the statements and arguments are supported by the evidence and appeal to your reason and judgment." (N.T. 3-22-2016 morning session, pp. 19-20).

The jury was issued this more detailed admonition in advance of closing arguments:

> "Now, speeches of counsel are not part of the evidence and you should not consider them as such. However, in deciding the case, you should carefully consider the evidence in light of the various reasons and arguments each lawyer presents. It is the right and duty of each lawyer to discuss the evidence in a manner that is most favorable to the side that they represent.
>
> You should be guided by each lawyer's argument to the extent they are supported by the evidence and insofar as they aid you in applying your own reason and common sense. However, you are not required to accept the arguments of either lawyer. It is for you and you alone to decide the case based on the evidence as it was presented to you from the witness stand and in accordance with the instructions I am now giving you." (N.T. 3-31-2016, pp. 80-81).

While the courts have held that it is improper for a district attorney to express their personal opinion about a defendant's guilt, the courts have also clearly stated that "a district attorney must have reasonable latitude in fairly presenting a case to the jury and that he or she must be free to present his or her arguments with 'logical force and vigor.'" *Commonwealth v. Smith*, 490 Pa. 380, 387, 416, A.2d, 986, 989 (1980) *quoting Commonwealth v. Cronin*, 464 Pa. 138, 143, 346

A.2d 59, 62 (1975). "Furthermore, the district attorney may always argue to the jury that the evidence establishes the defendant's guilt. Finally, the prejudicial effect of the district attorney's remarks must be evaluated in the context in which they occurred." *Id.*

Further, "reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors, and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict." *Commonwealth v. Hanible*, 612 Pa. 183, 248, 30 A.3d 426, 465 (2011) *quoting Commonwealth v. Cox*, 603 Pa. 223, 983 A.2d 666, 685 (2009). Counsel's closing argument impeached the defense arson expert, who clearly had ignored many pertinent facts when attacking the credibility of the Commonwealth's expert, as well as addressed the defendant's motive for starting the fire. A review of both closings clearly shows that the prosecutor's remarks were in response to the defendant's closing and could not have prejudiced the jury to preclude them from fairly weighing the evidence and rendering a true verdict.

### *Prosecutorial Misconduct - Using Expert's Prior Reports*

Dougherty also laments that this court erred by allowing the prosecutor to cross-examine their expert regarding contents of the expert's prior reports without permitting the expert to explain in violation of Pennsylvania Rule of Evidence 106.

Pennsylvania Rule of Evidence 106 governing the Remainder of or Related Writings or Recorded Statements states:

> "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part – or any other writing or recorded statement –that in fairness ought to be considered at the same time." Pa.R.E. 106.

28

Although the defendant does not cite the record where this occurred, a review of the transcript discloses the following as the possible complained of questioning:

> Q. Now, Mr. Lentini, you told us, have you not – counsel marked one of your reports, the most recent one of 2016?
> A. Right, yes.
> Q. Well, you have written other reports related to this fire, right?
> A. There were certain narrow issues that I was asked to address early on in this fire not for the purpose of coming to trial.
> Q. You – didn't you put those – prepare those reports at the request of counsel for Mr. Dougherty for what happened at 929-and-a-half Carver Street when Little Johnny and Little Danny were killed?
> A. I did
> Q. Okay. But these are not as comprehensive as my last one because there was narrow issues.
>
> Mr. Fryman: Your Honor, objection. Can we have a sidebar, please?
>
> The Court: Certainly.
>
> (Sidebar discussion held off the record among counsel and the Court.)
>
> The Court: Give the jury a break. ....
>
> (The following occurs in open court outside of the presence and hearing of the jury.)
>
> Mr. Fryman: May I place on the record, Your Honor, I have objected with respect to the earlier reports. Suggesting in the questioning of Mr. Conroy, that Mr. Lentini had – that there was some deficiencies in the reports, things that he was failing to address when in fact, the focus of those reports was at a different stage in these proceedings, that we were in post-conviction addressing ineffective assistance of counsel, addressing issues that Judge Hughes raised in a PCRA hearing so that it was inappropriate for Mr. Conroy, in his use of those reports, to be suggesting there was some failures on Mr. Lentini's part when those reports were written for a specific purpose.
>
> The Court: I will overrule.
>
> Mr. Lentini, when any of these questions come up, do not refer to ineffective assistance of counsel or PCRA. Do not mention a prior conviction.
>
> The Witness: Right.
>
> The Court: Or a prior trial. Okay?
>
> The Witness: Right.
>
> Mr. Fryman: But, Judge, with respect to counsel, though, I think that he should refrain from going down the path that suggests
> –

29

Mr. Conroy: I have been doing it the whole trial as "a prior proceeding." I never – if there was an innocuous representation to that, I have been saying "prior proceeding."

Mr. Fryman: I understand. No, the implication is failures on Mr. Lentini's part when there was specific purposes for which those were written. That's the issue in the questioning, not the fact that there's reference to it.

The Court: He's going to be allowed to ask what about the prior reports and what's contained in them. I will overrule the objection.

(N.T. 3-30-2016 morning session, pp. 55-58).

The only limitation placed on this witness was that he was precluded from telling the jury that there had been a previous conviction or that there had been post-conviction hearings for this defendant on this arson matter. The references were minimal and no direct reference was made to a prior trial – only to prior proceedings. The witness was properly instructed so as to preclude any mention of a prior conviction on these charges. *Commonwealth v. Wallace*, 55 Pa. 397, 410-11, 724 A.2d 916, 923 (1999); *Commonwealth v. Topa*, 299 Pa.Super. 73, 410 A.2d 354 (1979); *Commonwealth v. Beach*, 445 Pa. 257, 284 A.2d 792 (1971). Clearly, allowing the defense to bring out the nature of the prior proceedings would have informed the jury of the defendant's prior conviction for these charges and as such, the testimony was properly restricted.

Lastly, the defendant contends this court erred in allowing the prosecutor to cross-examine their expert regarding the contents of an email by a non-testifying witness. Dougherty complains that the email was not provided to him prior to trial or during its use.

In *Brady v. Maryland,* 373 U.S. 83, 83. S.Ct. 1194, 10 L.Ed.2d. 215 (1963), the United States Supreme Court held that the prosecution's failure to disclose exculpatory evidence violates the Due Process Clause of the Fourteenth Amendment "where the evidence is material either to guilt or punishment." To establish a *Brady* violation, a defendant must demonstrate that exculpatory or impeaching evidence, favorable to the defense, was suppressed by the prosecution to the

30

prejudice of the defendant. *See Strickler v. Greene*, 527 U.S. 263, 281-282, 119 S.Ct. 1936, (1999); *Commonwealth v. Clark*, 599 Pa. 204, 961 A.2d 80, 89 (2008); *Commonwealth v. Tedford*, 589 Pa. 639, 960 A.2d. 1, 30 (2008); *Commonwealth v. Paddy*, 569 Pa. 47, 65, 800 A.2d 294, 305 (2002). "No *Brady* violation can occur where the evidence is available to the defense through non-governmental sources, or, with reasonable diligence, the defendant could have discovered the evidence." *Commonwealth v. Carson*, 590 Pa. 501, 544, 913 A.2d 220, 245 (2006), *cert. denied*, 128 S. Ct. 384 (U.S. 2007). To satisfy the prejudice inquiry, the evidence withheld must have been material to guilt or punishment. *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1126 (2008); *Commonwealth v. Dennis*, 597 Pa. 159, 950 A.2d 945, 966 (2008). Evidence is considered material if there is a reasonable probability, sufficient to undermine confidence in the outcome of the trial, that the results of the proceeding would have been different if the evidence had been disclosed to the defense. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Commonwealth v. Clarke, supra; Commonwealth v. Tedford, supra; Commonwealth v. Gibson, supra* at 1127; *Commonwealth v. Puksar*, 597 Pa. 240, 951 A.2d 267, 281 (2008).

Although the defendant does not cite the contested portion of the trial, a review of the notes leads to the following exchange which is assumed to be the complained of testimony:

> Q. You mentioned Mr. Cox yesterday, right, sir?
> A. Yes.
> Q. Talked about flashover and what occurs after flashover, right? You mentioned Mr. Cox's name?
> A. Yesterday I did, yeah.
> Q. Okay. You know, I was just wondering, in a situation like this, where there is clearly flashover in a contained structure, whether or not when this fully burns, whether or not there would be any patterns left from the original fire?
> A. If you put it out there, you would probably find a nice, clean burn by the origin that is more pronounced than elsewhere. So you may be able to determine the origin there if you put it out at the moment of flashover.
> That didn't happen in this case.

31

Q. Mr. Cox sent me his study.

Mr. Fryman: Can we place it in front of the witness?

Mr. Conroy: I will read it. He referred to it. He knows Mr. Cox.

By Mr. Conroy:

Q. You referred to this, right?

A. I did, but you are going to read a paragraph, I would like to see the paragraph.

The Court: You can ask the question.

By Mr. Conroy:

Q. Let me see if this sounds familiar. You referred to the Origin Matrix Analysis yesterday. You referred to that, right?

A. I did.

Q. So you know what I am talking about?

A. I do.

Q. Not my wheelhouse. This is yours. See if this sounds familiar.

Mr. Fryman: What page?

Mr. Conroy: Page 18.

By Mr. Conroy:

Q. Do you have that right —

A. May I have it?

Mr. Fryman: I don't see a Page 18 here.

Mr. Conroy: Concludes, Andrew Cox — Judge, we could copy it. I don't want there to be unfairness. I want Mr. Lentini to see the report that he referred to.

Mr. O'Brian, I apologize.

(Pause.)

Court Officer: To the witness.

Mr. Fryman: Is this C-35?

Mr. Conroy: Yes, thank you.

Court Officer: So marked C-35, Your Honor.

Mr. Conroy: Thank you.

(N.T. 3-30-2016 morning session, pp. 91-93).

The witness had mentioned the authoritative work and its author in his direct examination. That made the inquiry into Mr. Cox's treatise ripe for cross-examination. Clearly, the treatise was not favorable to the accused and was not *Brady* material, nor does it fall under the mandatory disclosure provisions of Pennsylvania Rule of Criminal Procedure 573. The Commonwealth merely used another expert's dissertation, which had been mentioned by the defense expert to

discredit Lentini.  The expert was familiar with the work.  The record further discloses that the material was produced for the witness.

Accordingly, the judgment of sentence of this court should be affirmed.

BY THE COURT:

J. SCOTT O'KEEFE, J.

DATE: September 1, 2016

33